IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-00584-NYW-NRN

NATE MORTON,

Plaintiff,

v.

TOWN OF FIRESTONE, COLORADO, and
DAVID MONTGOMERY, in his individual capacity,

Defendants.

---

## ORDER ON
## PLAINTIFF'S MOTION FOR COURT TO DENY DEFENDANT'S CLAIM OF PRIVILEGE AND TO COMPEL PRODUCTION OF PERSONNEL RECORDS
## (Dkt. #54)

---

**N. REID NEUREITER**
**United States Magistrate Judge**

This matter came before the Court on a discovery dispute on August 24, 2023. (Dkt. #51.) The Court heard argument on two issues. The first issue was whether an investigative report (the "DeMarco Report") in the possession of the Defendant Town of Firestone ("Defendant Firestone") was privileged and needed to be produced by Defendant Firestone. The second issue was whether the personnel records of certain police officers needed to be produced. On the issue of the DeMarco Report, I agreed to review the item *in camera* to assess whether it was properly withheld as privileged. (*See* Dkt. ##51, 51-1.) On the issue of the personnel records, I asked for supplemental briefing. (*See* Dkt. #51.)

On September 1, 2023, consistent with the request for supplemental briefing, Plaintiff Nate Morton ("Plaintiff" or "Sgt. Morton") moved to deny Defendant Firestone's claim of privilege on the DeMarco Report and to compel production of the disputed personnel records. (*See* Dkt. #54.) Defendant Firestone filed a response on September 6, 2023 (Dkt. #57) conceding that any privilege associated with the DeMarco Report had been waived. The DeMarco Report is therefore no longer at issue and the document has been produced to Plaintiff, who is entitled to use the report for whatever legitimate and admissible purposes he sees fit. (*See* Dkt. #57 at 1 ("Defendant concedes that any privilege related to the DeMarco report is waived.").) However, Defendant Firestone maintains that the personnel records of the officers are private, and that there has been an insufficient showing to overcome the presumption of privacy for these records.

**Background**

This is a civil rights lawsuit brought by Plaintiff Nate Morton, a former Firestone Police Department ("FPD") officer and sergeant, who resigned from his position following fifteen years of service. (Dkt. #53 at 1.) The events leading to Sgt. Morton's resignation occurred in December 2019 when he investigated a reported stolen vehicle. (*Id.* at 2.) After locating the stolen car, Sgt. Morton kept for himself certain abandoned property that had been discovered inside the vehicle. (*Id.*) Plaintiff alleges that he only kept the items after the car's owner declined ownership of the items and the FPD's evidence technician instructed him to dispose of the items in the garbage. (*Id.*) While his actions may have violated official department policy, Sgt. Morton says that taking items

that otherwise would have been thrown away was common practice among FPD employees. (*Id.*)

The FPD investigated Sgt. Morton's conduct and determined that his employment should be terminated. (*Id.*) Instead of being terminated, Sgt. Morton was permitted to resign. (*Id.* at 8, ¶ 37.) However, Sgt. Morton alleges that he had previously been outspoken in making complaints of internal corruption, misconduct, and favoritism within the FPD, causing tension with then-Chief of Police, Defendant David Montgomery. (*Id.* at 1.) In addition to causing him to lose his job, Defendants referred Sgt. Morton for criminal prosecution, something that had never been done in response to any other officer's misconduct. (*Id.* at 2.) Nevertheless, Sgt. Morton was not immediately charged with a crime. (*Id.*)

Nearly one year later, Sgt. Morton testified under oath during a deposition regarding his knowledge of the inner workings of the FPD. (*Id.*) The testimony resulted in a lengthy independent investigation into the FPD, and Sgt. Morton alleges that those findings led to the resignation of Defendant Montgomery. (*Id.*) Three months after his testimony, Sgt. Morton was charged with theft for the actions that had occurred over one year prior to his deposition. (*Id.* at 3.) Plaintiff alleges that the criminal charge against him was not supported by any evidence to establish guilt of the crime of theft and lacked probable cause. (*Id.*) Sgt. Morton was acquitted of theft by a jury after only one hour of deliberation. (*Id.*)

Plaintiff brings civil rights claims against Defendant Firestone and Defendant Montgomery for retaliation in violation of his First and Fourth Amendment rights and corresponding rights under the Colorado Constitution. Plaintiff claims that other FPD law

enforcement officers had kept otherwise abandoned property and not been charged with theft. (*Id.* at 10, ¶ 48.) He alleges that one such officer was Lieutenant Alan Yoder, who took construction materials that belonged to Defendant Firestone but was not referred for prosecution. (*Id.* at 9-11, ¶¶ 43-51.)

Plaintiff alleges that his prosecution was pursued because he testified truthfully in a sworn deposition on December 18, 2020, about favoritism, corruption, and other misconduct by Defendant Montgomery and others in the FPD. (*Id.* at 15, ¶ 73.) Plaintiff claims that other officers who had not been critical of the FPD or Defendant Montgomery were not prosecuted for similar conduct. (*Id.* at 20, ¶ 115.)

Other officers and former employees of the FPD will be deponents or trial witnesses in this case. It is for this reason that Sgt. Morton claims he should have access to the personnel files of four potential witnesses: Alan Yoder, Chris Ross, Braden Miniter, and Derek Stetson. (*See* Dkt. #54 at 7.) Sgt. Morton claims that all four of these men were members of the FPD at the time of his employment there and that their "disparate disciplinary treatment for similar or more egregious conduct will be evidence in support of Plaintiff's claims." (*Id.*)

Sgt. Morton does not seek production of confidential health information or benefits information from these officer's files. (*Id.*) Rather, Sgt. Morton seeks information "having to do with the relevant employees' job titles, job performances, pay rates, promotions, disciplinary consequences, and qualifications." (*Id.*) Sgt. Morton argues that to the extent the personal privacy of the officers involved is the basis for an objection to production, Plaintiff's need for the requested files far outweighs the interest in such files, especially in light of an operative protective order. (*Id.* at 8.)

4

**Standard for Production and/or Protection of Personnel Files**

All parties appear to agree that the standard for the production of personnel files of law enforcement officers was properly articulated in the case of *Scherbarth v. Woods*, No. 16-cv-2391, 2018 WL 851344 (D. Colo. Feb. 13, 2018). *Scherbarth* involved a civil rights lawsuit against police officers where the plaintiff had alleged use of excessive force and false arrest and imprisonment. The plaintiff sought personnel and internal affairs files for the defendant officers.

The United States Supreme Court recognizes public officers have a constitutional right of confidentiality—albeit not absolute—in private, personal information such as may be contained within a personnel or investigation file. *Whalen v. Roe*, 429 U.S. 589, 599 (1977) ("individual interest in avoiding disclosure of personal matters"); *Nixon v. Admin. of Gen. Servs.*, 433 U.S. 425, 457 (1977) ("[P]ublic officials, including the President, are not wholly without constitutionally protected privacy rights in matters of personal life unrelated to any acts done by them in their public capacity."). The question, as articulated in *Scherbarth*, is whether Plaintiff has a need for the information contained in the presumptively private files "that would outweigh that interest." *Scherbarth*, 2018 WL 851344, at *2. This question is to be resolved by looking at the issue through the lens of Fed. R. Civ. P. 26(b)(1): balancing the need for the information with the "annoyance, embarrassment or oppression likely to result from disclosure." *Id*. at *3.

In *Scherbarth*, the plaintiff argued that he needed the defendant officers' personnel and internal investigation files because their credibility was a critical issue for his excessive force claim and the files might contain impeachment evidence. *Id*. The

5

*Scherbarth* plaintiff argued that the plaintiff and the officer defendants were the only witnesses to the events, and without the personnel files, the plaintiff would likely have no way to impeach the defendants' credibility or challenge their version of events. *Id*. Ultimately, in the *Scherbarth* case, the Court allowed the production of personnel records and internal investigation files, subject to a protective order, and the files were disclosed on an "Attorney's Eyes Only" basis, restricting disclosure to the parties' attorneys for use in the case. *Id*. at *4.

In this case, the issue is not production of personnel files of specific defendants. The officers from whom Plaintiff seeks personnel files are not parties to this case. This is not an excessive force case where the word of the plaintiff will be measured against the word of the defendant.

Addressing each of the current or former officers individually, their alleged roles, and the significance of their potential testimony is important to making the correct decision on these issues.

<u>Alan Yoder</u>

Lt. Yoder was a lieutenant with the FPD in 2019, and Sgt. Morton alleges that Lt. Yoder's personnel file will likely lead to admissible evidence regarding preferential treatment by Defendant Montgomery. (Dkt. #54 at 7.) Plaintiff alleges that Lt. Yoder was investigated for and admitted to taking possession of town property (a countertop from a construction site), similar conduct to that which prompted Sgt. Morton's termination and prosecution. (*Id.* at 8.) Yet, Lt. Yoder was neither terminated nor prosecuted. (*Id.*)

Beyond the issue of the countertop, Sgt. Morton asserts that there is deposition testimony confirming that Lt. Yoder made a series of derogatory comments to

6

coworkers both during and after the countertop investigation—statements which allegedly led to Lt. Yoder's resignation in lieu of termination. (*Id.* at 9.) Sgt. Morton protests that no records of any such derogatory comments have been produced by Defendant Firestone and argues that this failure justifies an order that Defendant Firestone produce Lt. Yoder's entire personnel file. (*Id.* at 8-9.) Sgt. Morton makes no argument about a specific need to impeach the testimony of Lt. Yoder.

Defendant Firestone indicates, and Plaintiff acknowledges, that Defendant Firestone has already produced Lt. Yoder's disciplinary records relating to the countertop. (*Id.* at 8–9.) As to the incident regarding derogatory comments made to coworkers, Defendant Firestone argues that it had properly objected to the relevance of any discipline files after Sgt. Morton's departure from the FPD. (Dkt. #57 at 3 n.3.)

Considering the fact that the disciplinary records relating to the countertop incident have already been produced, the relevance of testimony about Lt. Yoder's alleged derogatory comments is not apparent, and there is no specific claim that any of the other parts of the personnel file might be useful for impeachment purposes, the Court will not require production of any more of Lt. Yoder's personnel file or disciplinary records. The objection to production of more of Lt. Yoder's personnel file is SUSTAINED.

<u>Chris Ross</u>

Chris Ross was FPD's Evidence Technician at the time of the December 11, 2019 incident leading to Sgt. Morton's separation from employment and eventual criminal prosecution. (Dkt. #54 at 9.) Plaintiff claims that Mr. Ross's personnel file is "critical to Sgt. Morton's claims" because Sgt. Morton says that it was Mr. Ross who had

7

instructed him to dispose of the property that Sgt. Morton was eventually charged with stealing. (*Id.*) Mr. Ross eventually provided an affidavit that contradicts Sgt. Morton's account. (*Id.*) It is claimed that Mr. Ross's "credibility will be central to a jury's determination of Sgt. Morton's intent and whether he was operating according to a directive from Mr. Ross, the person in charge of Firestone's evidence room." (*Id.*)

A mere assertion that a witness's credibility is at issue is not generally enough to overcome the presumption of privacy in personnel records. There must be something more, otherwise personnel records would be produced automatically in any case where a police officer or public employee is a witness. Plaintiff emphasizes that Mr. Ross is different, in part because information already produced reveals information about Mr. Ross's significant history of misconduct, including: "(1) pepper spraying two security officers who placed a boot on his illegally parked vehicle, (2) getting in the face of and nearly fighting a driver involved in a fatal car accident, and (3) threatening to stop training a subordinate female employee if she did not engage in a sexual relationship with him." (*Id.*) Sgt. Morton argues that none of this conduct led to a criminal prosecution of Mr. Ross, and that this history (and any other disciplinary infractions in his record)—and therefore the personnel file—for Mr. Ross is relevant to Sgt. Morton's claim of discriminatory treatment as a result of having exercised his First Amendment rights. (*Id.* at 10.) Sgt. Morton also insists that any Internal Affairs investigations of or disciplinary consequences imposed on Mr. Ross prior to his separation from the department speak to Mr. Ross's credibility. (*Id.*)

Defendant Firestone, for its part, argues that Mr. Ross was an officer with FPD for over fifteen years who resigned in 2021, and because of his long tenure with the

FPD his personnel file is voluminous and filled with sensitive information completely unrelated to the issues in this case. (Dkt. #57 at 4.) Defendant Firestone also argues that the issue of whatever was discussed in the phone call will have minimal bearing on the issue of whether there was probable cause for the charges, in part because Sgt. Morton never shared his version of the call until much later. (*Id.* at 5.) Defendant Firestone also argues that it has already disclosed "substantial disciplinary files" from Mr. Ross's personnel records, and to the extent that there are any questions about Ross's alleged unequal treatment, there are other sources of information (Sgt. Morton himself, supervisors, and employees who were working in the FPD at the time) to get essentially the same information. (*Id.*) Defendant Firestone argues that there is neither a scarcity of evidence nor the compelling need present in *Scherbarth* that would warrant the production of Mr. Ross's entire personnel file. (*Id.* at 6.)

The Court finds that the factual circumstances of Mr. Ross's involvement in the circumstances of this case merits the production of his entire personnel file (minus any private health, financial, or personal identifying information). Defendant Firestone has already produced *some* disciplinary records, but that means that Plaintiff must rely on the judgment of defense counsel to decide what may or may not be useful in any cross examination. In addition, there apparently exists a conflicting affidavit about what was said during a critical phone call, and the credibility of Mr. Ross is likely to be an important issue in light of that affidavit. In addition, the fact that Mr. Ross had potential criminal infractions go unreferred for prosecution may be relevant to the claim of discriminatory treatment. That other people may testify about things they may remember does not overcome the reality that hard documentation provides a better

9

record than potentially fallible memories. Therefore, the objection to the production of the entirety of Mr. Ross's personnel file is OVERRULED.

### Derek Stetson

Derek Stetson is a former FPD officer who resigned in the wake of the initiation of a Weld County Sherrif's Office criminal investigation in January 2020. (Dkt. #57 at 6.) Officer Stetson was only an officer for two years. (*Id.*) Officer Stetson responded to the scene of the stolen vehicle on the night of December 11, 2019, and requested that FPD officer Brandon Minter set aside two of the hammocks from the stolen car and place them inside the police department. (*Id.*) Officer Stetson later took the hammocks home. (*Id.*) When confronted, he confessed to having taken the hammocks. (Dkt. #54 at 11.) Officer Stetson later pled guilty to, and judge accepted a guilty plea for, the same charges that Sgt. Morton had faced. (Dkt. #57 at 6.)

Sgt. Morton asserts that Officer Stetson was immediately offered the opportunity to resign, as compared to Sgt. Morton, who had been informed he would be terminated. (Dkt. #54 at 11.) Sgt. Morton claims that he needs the personnel file of Officer Stetson because it will somehow support his claim of differential treatment. (*Id.*)

The Court does not find these arguments compelling for the production of Mr. Stetson's <u>entire</u> personnel file. The Court agrees that any disciplinary or personnel records relating to the hammock incident and Officer Stetson's eventual separation from FPD should be produced. But there is no need for production of Officer Stetson's entire personnel file. Therefore, the objection to the production of Officer Stetson's complete personnel file is OVERRULED IN PART. Plaintiff should be given only that portion of the personnel or disciplinary records relating to investigation and discipline for the hammock

10

incident and his separation from FPD. All health and personal financial information should be redacted.

### Brandon Minter

Branden Minter was one of the FPD officers on scene the night of December 11, 2019. (Dkt. #54 at 11.) Officer Minter has been employed by Defendant Firestone as a police officer since July 2017. (Dkt. #57 at 7.) Officer Minter, pursuant to Officer Stetson's directive, was the first person to take items from the stolen vehicle. (Dkt. #54 at 11.) Officer Minter received a message from Officer Stetson, asking that Officer Minter not throw away the hammocks. (*Id.*) Officer Minter aided Sgt. Morton in disposing much of the material removed from the car into the dumpster, but kept the two hammocks out, as directed by Officer Stetson. (Dkt. #57 at 7.)

Plaintiff notes that Officer Minter's employment was not terminated as a result of his involvement, nor was he referred for criminal prosecution despite what Plaintiff calls Officer Minter's "active participation essentially as an accomplice to the alleged 'theft.'" (Dkt. #54 at 11.) Plaintiff says the contents of Officer Minter's personnel file is "essential" to the retaliatory treatment claim. (*Id.*) Per Plaintiff, "Officer Minter's qualifications, job performance, history of promotions and/or demotions, as well as the length of time he had spent working in law enforcement are all relevant to whether his differential treatment is evidence of retaliation against Sgt. Morton." (*Id*.)

Defendant Firestone, for its part, says that there is no articulable reason why the personnel file of this particular officer is necessary or discoverable, either in terms of credibility assessment or to prove discriminatory treatment. (Dkt. #57 at 7-8.)

With respect to Officer Minter, I agree with Defendant Firestone that the generalized allegations of discriminatory treatment are not enough to demonstrate the particularized need that courts require to find that personnel records of non-parties are discoverable. In the context of Officer Minter, the parties do not dispute that he was involved in disposing of the contents of the stolen vehicle and setting aside the hammocks—in the police department—at the request of Officer Stetson. There is no allegation that Officer Minter took for himself any property that did not belong to him. To the extent that Plaintiff wants to argue that Officer Minter's act of merely setting aside the hammocks at Officer Stetson's request made him an accomplice to the criminal activity who should have been fired and charged, then Plaintiff can make that argument. But obtaining Officer Minter's entire work history and personnel records will not add meaningfully to the discussion. I do not find that Plaintiff has made the showing of need necessary to gain access to Officer Minter's personnel file. Therefore, the objection to producing Officer Minter's personnel records is SUSTAINED.

**Conclusion**

Therefore, Plaintiff's Motion for Court to Deny Defendant's Claim of Privilege and to Compel Production of Personnel Records (Dkt. #54) is GRANTED IN PART and DENIED IN PART as described above.

Dated: September 21, 2023
   Denver, Colorado

N. Reid Neureiter
United States Magistrate Judge